# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TYRONNE JOHNSON** | **CIVIL ACTION** |
| **VERSUS** | **NO:  06-1144-ML-SS** |

**JO ANNE BARNHART, COMMISSIONER OF
SOCIAL SECURITY ADMINISTRATION**

## REPORT AND RECOMMENDATION

The plaintiff, Tyronne Johnson ("Johnson"), seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423.  Rec. doc. 1.

## PROCEDURAL HISTORY

On July 12, 2004, Johnson submitted an application for benefits, in which he contended that he became unable to work on January 22, 2002.  R. 53-55.  He reported that his back was injured, and he could not lift over ten pounds, he could not bend, nor could he stand for too long.  R. 64.  On August 18, 2004, his application was denied.  R. 24-27.  On August 18, 2005, there was a hearing before an Administrative Law Judge ("ALJ").  Rec. doc. 341-377.  On October 28, 2005, the ALJ

issued an unfavorable decision.  R. 9-21.  On January 20, 2006, the Appeals Council denied his

request for review.  R. 5-7.  On March 8, 2006, Johnson filed a complaint.  Rec. doc. 1.  On August

28, 2006, the matter was submitted on cross-motions for summary judgment.  Rec. docs. 9 and 10.

Johnson has been represented by counsel since the hearing before the ALJ.

## STATEMENT OF ISSUES ON APPEAL

Johnson's request for judicial review raises the following issues:

1. Did the ALJ fail to determine that Johnson was disabled for a closed period of disability?

2. Did the ALJ fail to consider the side effects of Johnson's medication?

3. Was the testimony of the vocational expert unreliable?

4. Did the ALJ fail to obtain evidence on medical equivalence?

5. Did the ALJ improperly discount the opinion of the treating physician?

## THE ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following findings relevant to the issues on appeal:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's disorder of the back (discogenic/degenerative) is a "severe" impairment, based upon the requirements in the Regulations (20 CFR § 404.1520(c)).

4. This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant has the residual functional capacity to perform light work as identified by the Commissioner at 20 CFR 404.1567(b), with a sit or stand option; limited stooping, twisting,

crouching, kneeling and climbing of stairs or ramps; no crawling, balancing or climbing of ladders or scaffolds; and avoidance of hazards such as heights, vibration, and dangerous machinery.

7.      The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8.      The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

9.      The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10.      The claimant does not have transferable skills.

11.      The claimant has the residual functional capacity to perform a significant range of unskilled light work (20 CFR § 404.1567).

12.      Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.22 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as an electronics worker, parking lot attendant, and mail clerk.

13.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

R. 20-21.

## ANALYSIS

a.      <u>Standard of Review</u>.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. <u>Newton v. Apfel</u>, 209 F.3d 448, 452 (5th Cir. 2000); <u>Spellman v. Shalala</u>, 1 F.3d 357, 360 (5th Cir. 1993). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); <u>Newton</u>, 209 F.3d at 452.

3

Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Id.; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa, 895 F.2d at 1022; Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

To be considered disabled and eligible for disability insurance benefits, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (1997).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Newton v. Apfel, 209 F.3d at 453; Greenspan v. Shalala, 38 F.3d

4

232, 236 (5th Cir. 1994), <u>cert</u>. <u>den</u>. 514 U.S. 1120, 115 S. Ct. 1984 (1995).[1]  The five-step inquiry

terminates if the Commissioner finds at any step that the claimant is or is not disabled.  <u>Leggett v.</u>

<u>Chater</u>, 67 F.3d 558, 564 (5th Cir. 1995).

The claimant has the burden of proof under the first four parts of the inquiry.  <u>Id</u>.  If he

successfully carries this burden, the burden shifts to the Commissioner to show that other substantial

gainful employment is available in the national economy, which the claimant is capable of

performing.  <u>Greenspan</u>, 38 F.3d at 236; <u>Kraemer v. Sullivan</u>, 885 F.2d 206, 208 (5th Cir. 1989).

When the Commissioner shows that the claimant is capable of engaging in alternative employment,

"the ultimate burden of persuasion shifts back to the claimant."  <u>Id</u>.; accord <u>Selders</u>, 914 F.2d at 618.

The Court "weigh[s] four elements of proof when determining whether there is substantial

evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and

examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age,

education, and work history."  <u>Martinez v. Chater</u>, 64 F.3d 172, 174 (5th Cir. 1995).  "The

---

[1]  The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  <u>Id.</u> §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  <u>Id.</u> §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  <u>Id.</u> §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  <u>Id.</u> §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  <u>Id.</u> § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (1994) ("Medical-Vocational Guidelines").

Commissioner, rather than the courts, must resolve conflicts in the evidence." Id.

b.      Testimony at Hearing.

Johnson testified that he was 42 at the time of the hearing. R. 344. He was married with five children. R. 350. He completed the twelfth grade. R. 350. He received worker's compensation. R. 351. His wife was employed as a waitress. R. 351. His last employment from 1999 to 2002 was with Avondale Shipyards as an electrical layout fitter. R. 345, 356. He previously worked as a truck driver, r. 345, and he still had a driver's license. R. 352.

Johnson injured his lower back and elbow when a pipe slipped out from beneath him and he fell back. R. 346  He had not worked since the accident. R. 346. He had surgery in January 2003, but it did not improve his condition. R. 347. He experienced pain and numbness in his right leg on a daily basis. R. 347. He continued to receive treatment from Dr. Robert Katz. R. 347-48.

He experienced drowsiness and dizziness from his medication. R. 348 and 353. He believed that he would become drowsy and dizzy he would have difficulty concentrating if he attempted to work while he took the medication. R. 348-49. He did not drive while he took the medication. R. 350. On the date of the hearing he took only Motrin 800 and it did not produce side effects. R. 350. The medication did not relieve his pain. R. 353. It just made him comfortable. R. 354.

In the typical day Johnson got up, ate breakfast and sat for a while. When his back began to hurt, he would lie down. He did not do much else. R. 349. Sometimes he went to the store with his wife. R. 349 and 353. He was able to dress himself, take care of his hygiene and prepare his food. R. 352. He did some housecleaning but not every day. R. 352. One of his sons cut the grass. R. 353. He did not take care of his children. They took care of themselves. R. 356.

He could not sit for more than 20 minutes before his legs started hurting. R. 349. He could

6

not stand for more than 5 minutes without pain, and could not walk more than half a mile without severe pain.  R. 350.  He stopped walking for exercise because of the pain.  R. 355.  He had trouble bending over and could not lift more than 10 pounds.  R. 354.  He did not do any exercise.  R. 354.

Dr. Grethe Wik was a doctor of osteopathic medicine and was certified in family medicine and occupational medicine.  R. 44-45 and 358.  She did not examine Johnson, but she reviewed his medical records.  The ALJ sought her opinion as to Johnson's physical condition.  R. 359.  In summary, she described the medical records as follows:

1.      Johnson was in good health until his injury on January 22, 2002 (R. 359);

2       The initial assessment was low back pain with radicular symptoms and a recommendation of orthopedic surgery (R. 359);

3.      A May 9, 2002 MRI revealed some mild bilateral stenosis and a disc bulge at L4-S1 but no significant impingement of the right S1 nerve root (R. 359-60);

4.      A June 5, 2002 evaluation found him with low back and leg pain (R. 360);

5.      An August 21, 2002 EMG nerve conduction test evidenced right S1 radiculopathy (R. 360);

6.      A right S1 nerve block was administered (R. 360);

7.      On October 21, 2002, Johnson saw Dr. Robert Katz who recommended that he return to work for a one month period with restrictions (R. 360);

8.      A second MRI found mild impingement on the L5 nerve root (R. 360-61);

9.      On January 7, 2003, a micro-laminectomy and discectomy on the right between L5 and S1 was performed, with a diagnosis of L5 to S1 herniated disc with right S1 radiculopathy (R. 361);

10.     A third MRI on February 27, 2003 revealed epidural scarring involving the right S1 nerve root (R. 361);

11.     On March 6, 2003, a nerve conduction study, which indicated, even after the surgery, that there was right S1 radiculopathy with possible early involvement of the right L5 nerve root (R. 361);

12.     On May 14, 2003, a lumber myelogram and post-myelogram CT scan revealed right disc protrusion at L5 to S1 (R. 361);

13.     There was a second nerve block (R. 361-61);

14.     A January 7, 2004 discogram was negative (R. 362);

15.     On February 4, 2004, he reached maximum medical improvement with a ten percent whole person impairment (R. 362);

16.     A March 2, 2004 functional capacity evaluation found that Johnson was capable of sedentary work (R. 362);

17.     A fourth MRI on October 21, 2004 revealed mild epidural fibrosis with the right S1 nerve root, a right foraminal disc protrusion closely approximating the right L5 nerve root, but no obvious deformity (R. 362-63);

18.     On December 2, 2004, Dr. Katz reported that Johnson could return to sedentary work for three months (R. 363); and

19.     On March 9, 2005, Dr. Katz imposed restrictions (no lifting greater than 10 pounds, no prolonged walking, standing, kneeling, squatting, crouching, stairs or ladders) and indicted Johnson was totally disabled (R. 363).[2]

Dr. Wik was asked if she saw anything in the medical records to substantiate Dr. Katz's finding of totally disabled.  She replied:

> I don't know why he marked totally disabled, and that he can't do regular employment.  That surprised me because in the notes just above, he's saying . . . he can do some lifting. . . .  The records (demonstrate) . . . positive non-organic signs, symptom magnification, so I have that on one end, but I have him neurologically intact. . . .  (S)aying he's totally disabled seems to be not consistent with what Dr. Katz had done prior to that, and would seem excessive to me.

R. 365-366.  She added that "there were positive non-organic signs. . .  how hard was he really trying on that exam. . . ."  R. 366.  "So without . . . the neurological findings, I'm wondering, just sedentary, wouldn't I be at - - least I would be looking at a light level."  R. 366.

___

[2] Dr. Wik's testimony refers to a two page form dated March 9, 2005 completed by Dr. Katz for an insurance company.  R. 208-09.

Wallace Stanfill testified as a vocational expert.  R. 371.  The ALJ's hypothetical question included Johnson's age, educational background and job experience at the light exertional level with limited stooping, twisting, crouching, kneeling, climbing of stairs and ramps, no crawling, balancing, climbing ladders or scaffolds, avoidance of hazards like dangerous machinery and sit/stand option. R. 372.  Mr. Stanfill listed jobs such as electronics worker, parking lot attendant and mail clerk that were be available.  R. 373.  There were also jobs available in the sedentary and unskilled category. R. 374-75.

c.      Medical Evidence-General.

On January 22, 2002, Johnson was injured at Avondale when he fell backwards on his right elbow and back.  R. 126-27 and 312.  He received first aid at Avondale and did not work for about a week.  R. 312.  The pain persisted and he saw Dr. Ann Holt-Minard.  R. 312.

On January 28, 2002, he was seen at Ochsner for complaints of persistent symptoms.  R. 135-36.  On February 19, 2002, he was seen by Dr. Jack Reid, an orthopedic surgeon at Ochsner, who diagnosed him with a lumbar strain.  R. 134.  On March 11, 2002, he returned to Dr. Reid, who kept him off of work because of persistent symptoms in the low back.  Physical therapy was prescribed. R. 133.  A May 9, 2002 MRI revealed mild asymmetrical bulging at L5-S1.  R. 130-31 and 312.  Dr. Reid noted that the MRI revealed mild stenosis at L4-L5 and some findings at L5-S1.  Johnson had made no improvement with medications, rest and physical therapy.  He was to remain out of work until after a second opinion by the physical medicine department.  R. 129.

On May 15, 2002, FARA, the worker's compensation carrier for Johnson's employer, requested that Dr. Katz see Johnson for a second opinion.  R. 317-18.  On June 5, 2002, Dr. Katz reported that there were objective findings from an MRI to support Johnson's complaints of back

pain.  He believed that Johnson required temporary work restrictions.  R. 148-50 and 312-14.  Dr. Katz found "a lot of muscle guarding and some symptom magnification, but MRI does show that he has impingement of the S1 root on the right."  R. 313.  There was no numbness or tingling to the foot, but the calf was numb.  Dr. Katz requested a nerve conduction study to determine if he had S1 radiculopathy.  He believed further studies were required before Johnson's work status could be determined, but if he returned to work, it would be light duty with restrictions.  R. 313-14.  Johnson decided to continue his treatment with Dr. Katz.  R. 306, 307 and 310.

On August 21, 2002, Dr. Gregory Redmann performed the nerve conduction study.  It revealed mild right S1 radiculopathy.  R. 154 and 309.  On September 4, 2002, Johnson was seen by Dr. Katz, who recommended a selective nerve block.  He was given an injection of cortisone.  R. 147 and 305.  On October 21, 2002, Johnson reported to Dr. Katz that he received excellent temporary relief from the nerve block.  Dr. Katz recommended a further nerve block and discussed a microdiscectomy.  R. 301.  On October 21, 2002, Dr. Katz released Johnson to return to work, but he was restricted to lifting no more than ten to twenty pounds and he was not to do excessive bending or stopping.  R. 144 and 301 and 303.  On October 24, 2002, Johnson returned to Dr. Katz in pain and asked to proceed with the surgery. He reported falling at home.  Dr. Katz took him off of work until the surgery was performed.  R. 142 and 298.

A November 7, 2002 MRI revealed an asymmetrical transitional lumbosacral segment and a mild asymmetric degenerative right posterior disc protrusion.  R. 141 and 296.  Dr. Katz proposed surgery to remove the disc impinging on the S1 root.  R. 116-17.  On December 11, 2002, Dr. Katz reported that Johnson was not released to return to work, it was unknown when he would be able to return to work, and that the prognosis was good.  R. 292.

10

On January 7, 2003, a microdiscectomy was performed at L5-S1 on the right side.  R. 282.
The procedure included a discectomy at L5-S1 on the right side with metrix tube system, a
foraminotmy at S1 on the right and an open epidural steroid injection.  R. 102-03.  On January 15,
2003, Johnson was seen by Dr. Katz and he reported mild low back pain with some pain in the right
leg.  Johnson was to remain off work for six weeks.  R. 115.  On January 29, 2003, Johnson returned
to Dr. Katz reporting pain, numbness and tingling into the right leg.  Dr. Katz prescribed physical
therapy and a short course of Prednisone.  R. 114 and 289.

On February 20, 2003, Johnson returned to Dr. Katz.  Even though Johnson had just
completed a three week course of tapered Prednisone, he continued to report right leg pain.  Dr. Katz
recommended a repeat MRI and a nerve conduction study.  R. 113.  A February 27, 2003 MRI
revealed postoperative changes on the right at L5-S1, a broad based disc bulge and epidural scarring.
R. 139.  On March 31, 2003, Johnson received a selective nerve root injection in the lumbar spine
at S1 on the right side.  R. 160.  On April 21, 2003, Johnson returned to Dr. Katz reporting pain in
the right leg.  Dr. Katz recommended a CT myelogram because he was not able to provide a good
reason for Johnson's continuing pain.  R. 111.  On April 25, 2003, Dr. Katz reported that Johnson
was not released to return to work and it was unknown when he would be able to return to work.
R. 278.

On May 14, 2003, a lumbar myelogram and post myelogram CT were performed.  Testing
revealed: (1) congenital variation of the S1 segment; and (2) protruding disc material to the right at
the L5-S1 level.  R. 276-77.  On June 9, 2003, Johnson continued to report pain in his right leg.  R.
110.  On June 27, 2003, FARA asked Dr. Katz to address the anticipated date of maximum medical
improvement and to consider a functional capacity evaluation for permanent work restrictions.  R.

11

273 and 275.  On July 8, 2003, there was a selective nerve root injection of the lumbar spine on the right side at S1.  R. 274.  On July 15, 2003, Dr. Katz reported to FARA that Johnson was not released to return to work.  Dr. Katz estimated his return to work at September 1, 2003, but the restrictions on his work were unknown.  He was referred for physical therapy rehabilitation.  R. 272.

On August 15, 2003, Johnson was seen by Dr. Katz.  Johnson reported that he only received temporary relief from a July 8, 2003 nerve block.  Dr. Katz recommended a further nerve block and a FCE to determine permanent restrictions.  R. 109.  On September 29, 2003, Johnson continued to complain of pain in the low back and right leg.  R. 108.  On October 22, 2003, Dr. Katz reported to FARA that Johnson was not released to return to work and estimated a return to work on January 1, 2004, but the restrictions on his work were unknown.  R. 268.

On January 7, 2004, Johnson underwent a provocative discography for the lumbar spine.  The results were negative at L3-4, L4-5 and L5-S1.  R. 264-65.  On that same day there was a CT scan which revealed no leakage of contrast from the discogram at L2-3 or L3-4.  There was mild central spinal stenosis at L4-5 and L5-S1.  R. 263.  On January 28, 2004, Dr. Katz reported to FARA that Johnson was not released to return to work.  R. 261.  On February 4, 2004, Johnson was seen by Dr. Katz, who reported that he was at maximum medical improvement.  Johnson was to return after an FCE, "so that we can try to get him back to gainful employment."  R. 107.  On February 2, 2004, Dr. Katz reported to FARA that Johnson was diagnosed with S1 radiculopathy, prognosis stable, with maximum medical improvement on February 4, 2004.  R. 260.  On February 19, 2004, Dr. Katz assigned Johnson a ten percent whole person permanent impairment based upon a surgically treated disc lesion with residual medically documented pain and rigidity of the lumbar spine.  R. 256.

On March 4, 2004, an FCE was completed.  Johnson demonstrated the physical ability to return to work at the sedentary level with restrictions.  171-89.  On April 6, 2004, Dr. Katz reported to FARA that Johnson was not released to return to work.  R. 337.  Following a visit on April 22, 2004, Dr. Katz reported he would refer Johnson to vocational rehabilitation to determine if he could get sedentary employment with restrictions.  Johnson was scheduled to return in three or four months.  R. 106.  After April 22, 2004, Dr. Katz reported to FARA that Johnson was not released to return to work.  R. 336.

On August 23, 2004, Johnson was seen by Dr. Katz.  He reported pain in the low back and right leg with numbness in the right leg.  X-rays revealed spina bifida at S1 with degenerative changes and sacralization at L5-S1.  Dr. Katz recommended a nerve block at S1.  R. 249.  On September 17, 2004, Johnson was given a transforaminal lumbar epidural steroid injection. R. 245-46. On October 15, 2004, Johnson reported no change in his pain symptoms reporting that the nerve root injection only provided relief for about 24 hours.  Dr. Katz recommended a further MRI.  R. 244.  A MRI taken on October 21, 2004 revealed:  (1) post-surgical changes at L5-S1 with right sided laminectomy and mild epidural fibrosis involving the right S1 nerve root origin; and (2) a far right paracentral/right foraminal disc protrusion which closely approximated the exiting right L5 nerve root without obvious deformity.  R. 242.  On November 4, 2004, Johnson was seen by Dr. Katz.  The examination revealed no acute distress.  He had a little pain in the lower back but mainly in the leg.  Dr. Katz described the MRI as demonstrating:  (1) a hemilaminotomy at L5-S1 on the right; (2) some epidural scarring; (3) no recurrent disc herniation around the S1 root; and (4) a far lateral disc herniation at L4-5.  Dr. Katz's plan for Johnson included managing him at the clinic, medication, and a return visit in three months.  He reached maximum medical improvement on

February 4, 2004 and the FCE of March 2, 2004 demonstrated that Johnson could do sedentary work with restrictions.  R. 241.

On December 2, 2004, Dr. Katz indicated that Johnson could return to sedentary work on December 3, 2004 and a new FCE was ordered.  R. 239-40.  On January 21, 2005, an FCE was completed.  It concluded that, "[b]ased on pain behavior and positive non-organic signs, it is very doubtful that Mr. Johnson would have performed at a physical demand level greater than sedentary . . . and would require . . . pain related restrictions. . . ."  R. 213.  These included handling materials or forces exceeding ten pounds.  R. 211-237.  On February 23, 2005, Johnson returned to Dr. Katz with reports of pain in the low back and right leg.  He reported trying to work for two days but was unable to do it.  Dr. Katz reported that Johnson had a far lateral disc herniation on the right side at L4-5.  Dr. Katz told Johnson that he would report to the worker's compensation carrier that he could do at least sedentary work.  Dr. Katz indicated that he would ask vocational rehabilitation services to find employment for him.  He was scheduled to return in three months.  R. 210.

On March 9, 2005, Dr. Katz completed a form for insurance purposes.  He reported that the last examination was on February 23, 2005.  The subjective symptoms were cramps and pain in the right leg.  There was confirmation by MRI.  Dr. Katz indicated that total disability began on November 27, 2002.  The restrictions included an inability to sit without changing positions, a need to avoid prolonged walking or standing, a need for back support when sitting, a need to avoid repetitive bending at the waist and a need to avoid kneeling, squatting , crouching, stairs, vertical ladders, and he could not lift more than ten pounds.  Dr. Katz indicated Johnson was totally disabled. He added that Johnson was waiting on vocational rehabilitation services.  R. 208-09.

On May 23, 2005, Johnson returned to Dr. Katz.  He continued to experience pain in the low

14

back and right leg.   Dr. Katz recommended that he contact the adjustor for the workers'
compensation insurer to ask for assistance with vocational rehabilitation.  Johnson was to return in
three or four months.  R. 206.

d.       Medical Evidence-Medication.[3]

On January 28, 2006, six days after he fell, Johnson was seen at Ochsner Clinic.  The note
indicates that after the accident his employer's doctor gave him Tylenol #4.  Johnson reported that
he used it sparingly as it made him sleepy.  He was also taking Motrin 400.  Ochsner changed his
medication to Voltaren and Robaxin.  R. 135.  On February 18, 2002, Dr. Reid, the orthopedist at
Ochsner, put him back on Tylenol #4, but instructed him to take it once a day at bedtime.  R. 134.
On March 11, 2002, Dr. Reid gave him a new prescription for Motrin 800.  R. 133.  Other than the
comment that Tylenol #4 made him sleepy, there is no evidence of side effects in the Ochsner
medical records.

Dr. Katz saw Johnson on June 5, 2002.  He reported that he was out of Motrin.  There is no
mention of side effects from medication.   Dr. Katz prescribed a course of cortisone and anti-
inflammatories.  R. 148-150.  There was no mention of side effects at the next visit on September
4, 2002.  R. 147.  The note for November 27, 2002 indicates that no medication was prescribed.  R.
116-17.  The note for January 15, 2003 reports that Vicodin made him feel uncomfortable and
Darvocet made him dizzy.  Because of these side effects, he was given Percocet 5.  R. 115.  The note
for January 29, 2003 does not refer to any side effects from Percocet.  A further course of cortisone
was prescribed.  R. 114.  On February 20, 2003, Ibuprofen and Vicodin were prescribed, but there
is no mention of side effects.  R. 113.  On March 10, 2003, Lortab was prescribed without mention

---

[3]  Because Johnson contends that the ALJ failed to properly consider the side effects of his medication,  the
evidence regarding medication is described separately from the other medical evidence.

of side effects. R. 112. On April 21, 2003, Ibuprofen was prescribed without mention of side effects. R. 111. On June 9, 2003, Johnson was taking Ibuprofen and some Tylenol. He was told to continue his medications. There was no mention of side effects. R. 110. On August 15, 2003, Ibuprofen and Vicodin were prescribed. R. 109. There was no report of side effects from medication for the visits on September 29, 2003 and February 4, 2004. R. 107-08. On April 8, 2004, it was reported that Johnson continued to take Motrin and Lortab and the only concern noted was the need to check the kidney and liver functions because of the continued use of anti-inflammatories. R. 106. On August 23, 2004, Johnson continued to take Motrin and Lortab without any note of side effects. R. 249. The note for the November 4, 2004 indicates that the laboratory results for the kidney and liver check were normal. Johnson was taking one Lortab at night and Ibuprofen during the day. Side effects were not noted. R. 241. On February 23, 2005, Johnson reported that he was sleepy during the day from his blood pressure medication. Dr. Katz changed his medication and prescribed Neurotin. R. 210. On May 23, 2005, Dr. Katz prescribed Neurotin and Skelaxin. There was no report of side effects. R. 206.

e.      Plaintiff's Appeal.

Issue no. 1.     Did the ALJ fail to determine that Johnson was disabled for a closed period of disability?

Johnson urges that he was disabled from the date of the injury, January 22, 2002, through the date on which Dr. Katz determined that he reached maximum medical cure. The Commissioner contends that he was able to work during this period and cites: (1) Dr. Katz's note that Johnson could return to work on October 21, 2002; (2) his note that Johnson would be unable to work for three months following surgery; and (3) his August 21, 2003 note that Johnson would be sent back to work with restrictions. "To meet the duration requirement the claimant must demonstrate . . . that

16

his disability prevented him or would prevent him from performing <u>any</u> substantial gainful activity for 12 continuous months." <u>Neal v. Bowen</u>, 829 F.2d 528, 530-531 (5th Cir. 1987) (emphasis in original), and 20 C.F.R. § 404.1509.  The ALJ found that Johnson was not under a disability at any time through the date of the decision on October 28, 2005.  R. 21.  Johnson's argument challenges that finding for the period from January 22, 2002 through February 4, 2004.  The issue is whether there is substantial evidence to support the ALJ's finding that Johnson was not disabled during this period.

After Johnson was injured on January 22, 2002, he received first aid.  R. 312.  When his symptoms persisted he was sent to Dr. Reid, an orthopedist.  R. 134.  On March 11, 2002, Dr. Reid kept him off work because of persistent symptoms.  R. 133.  On May 10, 2002, Dr. Reid reported Johnson was to remain off of work until after a second opinion.  R. 129.  Johnson's employer sent him to Dr. Katz for the second opinion.  R. 317-18.  Dr. Katz found evidence of S1 radiculopathy, but required further studies before Johnson's work status could be determined.  R. 313-14.  A nerve conduction study revealed right S1 radiculopathy that was mild in degree.  R. 309.  After a nerve block and further medication, Johnson returned to Dr. Katz on October 21, 2002.  R. 144.

The Commissioner cites the notes of the visit on Monday, October 21, 2002, as demonstrating that Johnson was able to return to work.  Johnson reported pain mainly in his right leg.  Dr. Katz recommended a further selective nerve block injection and discussed the options for surgery.  He asked Johnson to return for a follow-up after the nerve block.  The note ends with the following:

> I did give him a note to return back to work with restricted duty.  I told him that I do not want him doing any heavy bending, lifting, or squatting.  We will restrict lifting to 20 pounds.  I'll keep those restrictions on for one month.

R. 144.  If this was the end of the medical records, the Commissioner would be correct that Johnson's disability did not prevent him from performing any substantial gainful activity for 12 continuous months following the injury.  However, on Thursday, October 24, 2002, Johnson returned to Dr. Katz and reported that, "he slipped and fell at home on Tuesday (October 22, 2002) having severe leg pain and could barely get out of bed."  R. 142.  Johnson requested that Dr. Katz proceed with surgery.  Dr. Katz took Johnson off of work status until the surgery was performed. R. 142.  Johnson did not have surgery until January 7, 2003, and the period of disability was continuous from his injury on January 22, 2002 until the surgery on January 7, 2003.  R. 102-03. This is confirmed in part by Dr. Katz's December 11, 2002 report to the worker's compensation carrier.  He reported that Johnson was not released to return to work. [4]  R. 292.

After the surgery, Dr. Katz instructed Johnson to stay off of work for six weeks.  R. 115.  On March 10, 2003, Dr. Katz kept Johnson off of work.  R. 112.  On April 25, 2003, July 15, 2003, October 22, 2003 and January 28, 2004, Dr. Katz reported to the worker's compensation carrier that Johnson was not released to return to work.  R. 261, 268, 272 and 278.  On July 15, 2003, Dr. Katz estimated that Johnson would be able to return to work on September 1, 2003 but the restrictions were unknown.  R. 272.  On October 22, 2003, Dr. Katz pushed the return to work date back to January 1, 2004 but again indicated that the restrictions were unknown.  R. 268.  It was not until February 4, 2004 that Dr. Katz determined that Johnson had reached maximum medical improvement.  R. 107.

Although Dr. Katz reported on April 6, 2004, that Johnson was not released to work, there

---

[4]  This same form indicates that Johnson's disability began on November 27, 2002 rather than the date of the injury, January 22, 2002.  R. 292.  November 27, 2002 is the date on which Dr. Katz conducted a physical examination and proposed surgery.  R. 116-17.  The record demonstrates that both Dr. Reid and Dr. Katz believed that Johnson was unable to work from January 22, 2002 through October 21, 2002.  Johnson fell at home on October 22, 2002.

is other evidence that after February 4, 2004 he was able to do sedentary work with restrictions. This was the conclusion of the March 2, 2004 FCE.  R. 171-89.  On April 22, 2004, Dr. Katz referred Johnson to vocational rehabilitation for sedentary employment with restrictions.  R. 106. On December 2, 2004, Dr. Katz indicated that Johnson could return to sedentary work.  R. 239-40.

Substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  Prior to February 4, 2004, there is no relevant evidence to support the conclusion that Johnson could have engaged in any substantial gainful activity for 12 continuous months.  After February 4, 2004, there is such evidence.  Johnson is entitled to a closed period disability from the date of his injury on January 22, 2002 through February 4, 2004.  There is no reason to remand the case for the ALJ to consider this issue because there is no relevant evidence to support a contrary finding.

Issue no. 2.      Did the ALJ fail to consider the side effects of Johnson's medication?

Johnson contends that the ALJ misconstrued the evidence concerning the side effects of his medication.  He objects to the ALJ's statement during the hearing that there is no medical evidence that supports his contentions about the side effects of the medication and their impact on his ability to work.  He cites Loza v. Apfel, 219 F.3d 378 (5th Cir. 2000), and Crowley v. Apfel, 197 F.3d 194 (5th Cir. 1999).  In Loza, the Fifth Circuit found that the ALJ failed to consider the claimant's extensive medical treatment with antipsychotic and other mood altering medications.  219 F.3d at 397.  In Crowley, the court found that the ALJ's conclusion that the claimant suffered no adverse effects from medication prescribed for neuropathy and back pain was not supported by substantial evidence.  197 F.3d at 199.  The Commissioner acknowledges that the ALJ must consider the side

19

effects of the medication that a treating physician prescribes.  20 C.F.R. § 404.1529(c)(3)(iv).

The ALJ's decision includes the following:  (1) Johnson received some relief from his medication; (2) the side effects of properly regulated medications should be non-severe; (3) Johnson's "allegation of having side-effects from taking his medications is nonsevere;" and (4) he drives an automobile, attends church services and performs other activities of daily living.  R. 17. The ALJ's decision demonstrates that he considered the side effects of Johnson's medication.

There is substantial evidence to support the ALJ's finding that the medication could be regulated to avoid severe side effects.  The medical records from Ochsner and Dr. Katz cover more than three years.  During that period there are only three references to side effects from medication. On January 28, 2006, Johnson reported that Tylenol made him sleepy.  Dr. Reid responded to this by requiring him to take it before he went to bed.  R. 134-35.  On January 15, 2003, Johnson reported to Dr. Katz that Vicodin made him feel uncomfortable and Darvocet made him dizzy.  In response his medication was changed.  R. 115.  On February 23, 2005, Johnson reported that his blood pressure medication made him sleepy.  Dr. Katz changed the medication.  R. 210.

<u>Issue no. 3</u>.      Was the testimony of the vocational expert unreliable?

Johnson contends that the testimony of the vocational expert was deficient because the expert did not provide Dictionary of Occupational Title numbers for each of the positions identified by the expert in response to the ALJ's hypothetical question.  Johnson contends that the expert should have provided such numbers and the specific vocational preparation time for each position.  Johnson argues that the ALJ did not comply with Social Security Ruling 00-4p, 65 FR 75759, 2000 WL 1765299.  This ruling provides that, before an ALJ may rely on the evidence from a vocation expert, the ALJ must identify and obtain a reasonable explanation for any conflicts between the expert's

occupational evidence and the information in the Dictionary of Occupational Titles ("DOT").  Id.

The ruling states:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between the VE or VS evidence and information provided in the DOT.  In these situations, the adjudicator will . . . [a]sk the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and . . . (if the) evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

Id. at 75760.

The record demonstrates that the ALJ complied with SSR 00-4p.  The expert testified concerning Johnson's past work history and identified the requirements of his past work history in relation to the DOT.  R. 371.  In response to the hypothetical question, the expert reported on the jobs that Johnson could perform.  R. 372-73.  The ALJ sought descriptions of a "few" of the jobs. R. 373.   The expert identified electronics worker, parking lot attendant and mail clerk, and also provided numbers for those jobs in the local area and the nation.  R. 373.  In accord with SSR 00-4p, the ALJ asked if the expert's testimony was "in conflict with either the Dictionary of Occupational Titles or the Selected Characteristics of Occupations."  R. 373.  The expert replied:  "[n]o, sir, I've utilized those references."  R. 373.  SSR 00-4p did not require the ALJ to go any further.

The Commissioner contends and the undersigned agrees that if Johnson wanted to explore this further, his counsel had the opportunity to do so when he cross examined the expert.  Johnson's counsel, however, chose only to examine the ALJ on the impact of alleged side effects from the medication.  R. 376.  In Carey v. Apfel, 230 F.3d 131 (5th Cir. 2000), the Fifth Circuit said:

> [C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the

administrative hearing.

Id. at 146-47.

Issue no. 4.     Did the ALJ fail to obtain evidence on medical equivalence?

Johnson contends that Social Security Ruling 96-6p, 1996 WL 374180, requires an analysis by the ALJ of medical equivalence.  At the third step of the five-step analysis, it is necessary to determine whether a qualifying impairment is medically equivalent to a listed impairment.  20 C.F.R. § 404.1520(d).  Johnson complains that, while the ALJ obtained a medical expert (Dr. Wik), the expert did not testify about the issue of medical equivalence.  The ALJ found that Johnson's impairment did not meet or medically equal one of the listed impairments.  R. 20.  In response to the ALJ's question, Dr. Wik testified that no listing was met or medically equivalent.  R. 365.  Johnson's objection is not supported by the record.

Issue no. 5.     Did the ALJ improperly discount the opinion of the treating physician?

Johnson contends that the ALJ gave very little weight to the opinions of Dr. Katz, the treating physician.  He cites at length authorities on the weight to be given to the opinions of a claimant's treating physicians.  See Myers v. Apfel, 238 F.3d 617 (5th Cir. 2001), and Newton v. Apfel, 209 F.3d 448 (5th Cir. 2000).  He contends that the ALJ was required to request additional information from Dr. Katz before rejecting his opinion, yet he does not state what opinion was rejected.  His only reference to Dr. Katz's opinions and the evidence is a two page form from Primerica Life Insurance Company.  R. 208-09.  The boxes indicating that Johnson is totally disabled are checked "yes."  R. 209.  Johnson states:

> When this form is viewed, it is quite apparent that it was completed by a nurse and when compared with other signatures in the record, there is great uncertainty as to whether Dr. Katz even signed the form.

22

Rec. doc. 9 at p. 13.  It must be assumed that Johnson is contending that the ALJ improperly rejected the indication the on the form that Johnson was totally disabled.

In <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985), the ALJ rejected the treating physician's opinion that the claimant was totally disabled.  In reversing and remanding the Fifth Circuit said,

> This court has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability.  There are exceptions to this principle. The ALJ may give less weight to a treating physician's opinion when "there is good cause shown to the contrary," as is the case when his statement as to disability is "so brief and conclusory that it lacks strong persuasive weight," is not supported by medically acceptable clinical laboratory diagnostic techniques, or is otherwise unsupported by the evidence. The ALJ may also reject a treating physician's opinion if he finds, with support in the record, that the physician is not credible and is "leaning over backwards to support the application for disability benefits." The administrative fact finder is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly.  770 F.2d at 485

In <u>Newton</u>, the ALJ rejected the opinion of the claimant's treating physician that the claimant could not perform any sedentary work.  The Fifth Circuit reversed the decision of the ALJ and remanded for the purpose of requiring the ALJ to perform the analysis required by the SSR 96-2p, 1999 WL 271569, before rejecting the treating physician's opinion.  <u>Newton</u> is not applicable to Johnson's claim.  The Social Security Administration's regulations on the weight to be given to a treating physician's statements do not apply to a physician's statements on issues reserved to the Commissioner. 20 C.F.R. § 404.1527(e).  The regulations show that administrative findings that are dispositive of a case, including the opinion that the claimant is disabled, are reserved to the Commissioner.  The regulations state that, "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  20 C.F.R. §

404.1527(e)(1).  The indication on the insurance form of total disability is so brief and conclusory as to lack persuasive weight.  770 F.2d at 485.

Although the ALJ was not required to perform the detailed analysis described in 20 C.F.R. § 404.1527(d), the record demonstrates that the analysis was performed.  The regulation requires consideration of:

    (1)  the physician's length of treatment of the claimant,
    (2)  the physician's frequency of examination,
    (3)  the nature and extent of the treatment relationship,
    (4)  the support of the physician's opinion afforded by the medical evidence,
    (5)  the consistency of the opinion with the record as a whole, and
    (6)  the specialization of the treating physician.

Newton, 209 F.3d at 456.

The ALJ recognized that Johnson had surgery in January 2003 and that at the time of the hearing Johnson remained under Dr. Katz's care.  R. 347-48.  The ALJ determined that Dr. Katz was an orthopedic surgeon.  R. 366.  The ALJ obtained testimony from Dr. Wik on whether the medical evidence supported the conclusion that Johnson was totally disabled.  R. 365.  Dr. Wik testified that the conclusion of total disability was not consistent with the record.  R. 365-66.  The ALJ made similar findings.  R. 16.  There is substantial evidence to support these determinations.

After his injury and when his symptoms persisted, Johnson's employer sent him to Ochsner Clinic.  R. 135-36.  When Dr. Reid determined that a second opinion was required, Johnson's employer sent him to Dr. Katz.  R. 317-18.  Johnson, however, chose to continue seeing Dr. Katz.  R. 306-07 and 310.  From June 5, 2002 through May 23, 2005, Johnson was seen by Dr. Katz on at least eighteen occasions.  A typed report of each visit was prepared.[5]  These reports demonstrate

---

[5]  See R. 106-17, 147-50, 206, 210, 241 and 249.

that, after Johnson reached maximum medical improvement in February 2004, Dr. Katz reported that Johnson could perform sedentary work with restrictions in accord with the findings of the FCEs. The ALJ properly rejected the reference in the insurance form that Johnson was totally disabled.

The ALJ found that Johnson was able to do perform a significant range of light work . R. 19.  Johnson could argue, but does not, that this finding conflicts with Dr. Katz's opinions that Johnson could do sedentary work.  Even if it was determined that there was no substantial evidence to support the ALJ's finding regarding an ability to do light work, Dr. Katz's opinion that Johnson could sedentary work would remain.[6]  The ALJ obtained evidence from the vocational expert that there were a significant number of jobs in the local area and the nation in the sedentary category that Johnson could perform.  R. 375-76.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that Johnson's motion for summary judgment (Rec. doc. 12) be GRANTED in PART and DENIED in PART, defendant's cross-motion for summary judgment (Rec. doc. 16) be GRANTED in PART and DENIED in PART and that Johnson be awarded a closed period of disability from January 22, 2002 through February 4, 2004.

---

[6] Dr. Wik testified that Johnson could perform light duty work.  R. 366.

## **OBJECTIONS**

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 24th day of October, 2006.

**SALLY SHUSHAN**
**United States Magistrate Judge**

26